We will next hear from counsel in Mejia Lopez De Velasquez v. Garland. We have Mr. Usher and Mr. Callahan. Mr. Usher, you have reserved three minutes for rebuttal, is that correct? Three minutes for rebuttal. We are ready when you are, sir. Good morning, Your Honors. May it please the Court? My name is Mike Usher. I represent the petitioners in this case. This case comes before the Court on a petition for review from a decision from the Board of Immigration Appeals, which overturned or vacated a grant of asylum by the immigration judge here in New York City and ordered the petitioners deported without any further proceedings. It is the position of petitioners that the Board of Immigration Appeals erred in their decision by finding that the petitioner didn't experience any past persecution, didn't have a reasonable fear of future persecution, did not belong to a cognizable particular social group, and wasn't entitled to either withholding of removal or protections of the Convention Against Torture. And further, even if there were to be further review, this matter should have been remanded back down to the immigration judge for further proceedings. The Board of Immigration Appeals found in this matter that Ms. Mejia Lopez didn't belong to a particular social group because it was based on her membership in a nuclear family and that the purpose of the persecution was A, due to extortion only. Previously, this Court has found that failure to conduct a mixed mode of analysis was reversible error in Celedon Herrera v. Lynch. What evidence did she use that it was based on her family rather than on the fact that there was wealth there so that they could demand this money? And I ask this in light of what I think is record evidence suggesting that there was no subsequent actions taken against the family by the people demanding the money, notably her father, who was the one who had the money. Yes, Your Honor, that's correct. And I do address that in my papers. And essentially, the father and the sisters who still reside in the country are not similarly situated to the petitioners because they were not living alone and they weren't as easy... No, no, but I understand that's what made her vulnerable. But my concern is what evidence is there in the record that this was directed at her because of hostility toward her family? Other than the fact that the purported persecutors were MS-13, according to her testimony. And MS-13, they're not simply criminals. They're criminals with political motive. They're an international essentially cabal that functions in various countries, including obviously El Salvador, Ecuador, and Honduras. So there are certainly political aspects to any action taken by Mara Salvatrucha or MS-13 against families of wealthy landowners or farmers. So other than that, I would say that there isn't much evidence in the record, Your Honor. But I would submit to the court that instead of conducting a de novo review, as the Board of Immigration Appeals did, this matter should have been remanded back down to the IJ for further proceedings and further testimony. That's one of the biggest... So let me ask you, is political motivation required? The BIA rejected the proposition that this was an identifiable social group. But if the motivation was to threaten her and menace her and threaten to kidnap her son, precisely because she was a member of a wealthy family, a family with prosperous farms, and they could get money from it. Money was the motivation, but money was to be acquired from an identifiable social group being a member of a family that had the money. Is that sufficient under law, or does it have to be a politically based or a claim based on politics or religion or race or so forth? I would submit that it's sufficient under law, because a particular social group is a different aspect of the law than the race, religion, ethnic. That's what you're relying on, right? I mean, you just talked to us about MS-13 being politically motivated, but that was not the basis for the claim below. It was social group, right? Yes, Your Honor, which is why it's the petitioner's position that this matter should have been remanded for further proceedings and more testimony taken and potentially more evidence given. I'm sorry. So I think the argument you're trying to make is that she belongs to a particular group of women who live alone with children and was targeted because her family is wealthy, so there would be high payoff, low risk to any particular attacker. Is that right? But what I don't—the part that I'm struggling with is that our— we do have jurisprudence in this case that suggests being targeted because you are wealthy, and I guess what I'm looking for is, is there any legal significance to the two interacting, the single mother and a high payoff for extortion? Right. So that's our position, that the social group is more unique than the other case law provides that's in the Second Circuit case law. Essentially, it's not just that she's the daughter of a wealthy landowner and it's not just that she's a single mother living alone. It's that those two things make her a primary target for this international organized crime cabal, you could say, and which she had no protection from. Let me ask you that because I do have a concern that we might be taking a position that would be very favorable to wealthy asylum applicants here. She would have been able to live with her family. She's not a single mother living alone with no choice, right? Well, that's not the case. She was actually living alone. I understand that, but to the extent you're now suggesting that that somehow informs her particular social group. She was a woman who had a choice. I mean, some women do not have a choice, right? She could have lived with her family. Well, that testimony wasn't in the record, so then that leads me to my additional point about the remand, that the remand was appropriate for further proceedings. All right. Also, I mean, your time is running out. For the CAD claim, she doesn't need to establish a nexus at all, right? I was going to get to the CAD claim, Your Honor. Yes. To the extent you talk about the CAD claim, of course you have to show likely torture. And on that, I'm wondering whether you would explain whether you think she showed past torture or an imminent threat, again, given that no harm has come to the family as I understand it. So, again, she's a particular target. So even though there wasn't any past torture per se, the Board of Immigration Appeals essentially said that it was perfectly fine that she went to the police and the police told her, stay inside your house, stay locked in there. That was essentially their response. When the board decided that, they didn't have the benefit of our decision in Scarlet, right, about inability alone and acquiescence and all of that. But you didn't brief that either, that we've discussed that in Scarlet and what may have to be shown and whether she satisfied it. Right, Your Honor. I mean, this case was filed about four years ago, so that's true. Yes, but you're arguing today and the decision is more than a year old. Okay, go ahead. Yes, Your Honor. So as far as Kat goes, I would argue that there was no past torture, but there was a likelihood that she would be kidnapped, tortured. There was not only threats and unfulfilled threats, there was also burglarization of her home, which the Board of Immigration Appeals didn't even address in their decision, which we found troubling. And so there was clearly an escalation of their actions. They were following her, they were calling her, they were telling her what clothing she was wearing. This was an ongoing process. And when Judge Bain made her decision in this case, she found the totality of the circumstances was the relevant factor here, and she included in that decision the burglarization of the home. I would suggest that then the government is definitely, in this case, acquiescing or turning a blind eye to the potential torture of the petitioners, because when they went to the police, the police said we have a lot of these cases. It wasn't just they said we can't help you. It said we essentially can't help anyone. And Judge Bain also noted in her decision, which we certainly agree with, the Board didn't really address, is that the country conditions in Guatemala speak for themselves. There is rampant corruption. The police don't protect their citizens. And one of your positions is that the BIA didn't appropriately address the record evidence on the country conditions. Is that right? On the country conditions as well as the factual issue of the burglary as well. And then the prompt flight, right? That wasn't weighted either. I'm sorry, Your Honor. The prompt flight, the fact that she didn't stick around and wait for something to happen. Of course. Absolutely. So we submit in this situation, Your Honors, that in light of the record, in light of the glaring deficiencies in the Board's decision by simply ignoring certain arguments, like Your Honor said, the prompt flight, the burglary, as well as simply washing under the rug the police's reaction to Ms. Mejia's complaint. And we are talking about a case that had sufficient corroboration, regardless of the fact that she was found credible. She also submitted various affidavits. She submitted the police report. And none of that seems to have qualified her for cat, according to the Board. We submit that that's incorrect. So if my colleagues, do you guys have any more questions for me? No, thank you. Okay. Thank you so much. We'll have time. Thank you. And I still have my. Yes, you do. Yes. Thank you. Okay. Mr. Callahan, I would love to hear your presentation, and I'm hoping that you can focus on the response to the various ways in which the BIA didn't respond to certain information in the record. Certainly, Your Honor. I just want to say thank you and good morning, Your Honor. May it please the Court. My name is Brennan Callahan. I'm here on behalf of the Attorney General. When we talk about the various pieces of evidence that my colleague raises that the Board allegedly overlooked, I think it's important to remember what the Board was doing in this case. The Board was conducting a clear error review. They weren't conducting a de novo review, as I know my colleague has suggested several times. But the Board is careful throughout the decision to say that they're finding clear errors in the findings of the immigration judge. And so what we're reviewing today is whether or not the Board appropriately conducted that clear error review. We're not weighing out pieces of evidence that are in the record and deciding whether or not there's substantial evidence supporting the ultimate facts that came out of the Board's decision. Your Honors, I would like to just reiterate that this is an extortion case. This is not a persecution case. And because we're looking at the analysis the Board conducted relative to the clear errors that the immigration judge committed, I think it would be helpful to start with the nexus finding, because I think that speaks both to the past persecution finding that we have at issue here and any future persecution discussion that might be had. As we've discussed today, the immigration judge found that there was a nexus between the threatening phone calls that Ms. Mejia received and her particular social group. I want to just hone down on the particular social group quickly to say that the immigration judge styled that particular social group as Ms. Mejia's nuclear family. This new construction that there may be an interplay between her nuclear family and her living status and potentially any political motivation, that's something new that wasn't presented to the immigration judge. It wasn't raised on the appeal to the Board. This is something that's kind of come up for the first time here, and that's contrary to Board precedent about how those things need to be presented. I'm very sorry. I was looking for a site. Can you tell me again what it is you say was not considered by the Board? Certainly, Your Honor. This kind of new construction that there's some interplay between her nuclear family and her living situation and maybe any political opinion. So as I say, the immigration judge found— Excuse me. Can I ask you this? Yes, Rob. If the proposition that we're to adjudicate is that the identifiable social group is the family and the reason for targeting her as a member of the family is extortion, the purpose is extortion because of the family's wealth and the perception that she, as a vulnerable member of the family, would be a way to get at that wealth for extortion purposes, is that analysis disqualified from relief? I want to make sure I understand Your Honor's question. I don't think that—I think that a weighing out of the totality of the evidence to decide if there's substantial evidence supporting the Board's finding, that's not what we're doing today. What we are doing is— What I'm asking you is does it qualify for relief if the motivation of the extorters is— the motivation of those who threaten her is that they are looking for money through extortion? Does that mean that her claim is not valid? Yes, Your Honor. I think I understand your question better. And certainly if the motivation is extortion or criminal greed, that is not something that's on account of a protected statutory ground, a particular social group in this case. So that would not be an eligible claim for asylum. Turning back to the nexus element, as I say the immigration judge found a nexus between these threatening phone calls and Ms. Mejia's membership in her nuclear family. I do want to quickly distinguish something that my colleague raised about the kind of cumulative effect of several incidents. I think he's referring to she witnessed some men on the terrace of her home, her home was broken into. I don't think that we can safely say that those elements, those events are tied in with the calls. There's no indication on the evidence that the men on her terrace or the people that broke into her home are the same people that were calling her or that those were friends. Well, it's a remarkable coincidence, and some people don't believe in coincidences. So, I mean, in looking at this, if that's part of your argument that there were threats and there was action taken, in Scarlet we said, if it's sufficiently imminent, concrete, and menacing, that that can be the grounds to find that there was indeed past persecution. Certainly, Your Honor. I mean, is she supposed to wait until somebody fires at her or her child? No, certainly, Your Honor. I mean, I understand your nexus argument, but I'm a little harder pressed to understand why you don't think that this would support the past persecution finding. Certainly, Your Honor. As I say, I think you're right that this is a coincidence that she saw these men, that her home was broken into, that she's gotten these calls. I would point out that a big part of Ms. Mejia's argument is that So it is a coincidence, but we have nothing on the record to suggest that those three incidents. We don't, I think for Scarlet, though, we don't need to show that there's some sort of nexus for the persecution, right? So I think the question, the Scarlet question, is whether or not these unfulfilled threats themselves are persecution because they are so menacing in and of themselves. Certainly, Your Honor. I think that we would certainly never take the position that someone's got to wait until the gun is being fired for a threat to be imminent. Certainly not. It's important to remember that the imminence requirement, not requirement, but the imminence discussion also applies to threats or analysis of a well-founded fear of future persecution. So that imminence can come in there. But I think if we look at some of this Court's decisions about Well, look, you've got phone call threats, and that meant if that had been it, you would at least have had an argument that we've said threats alone are not always sufficient to establish persecution. But then you have a house break-in. At that point, what is your argument that the IJ could not find persecution? Well, Your Honor, I think it's important to look at the immigration judge's discussion of the past persecution. I think it's on page 86 of the record. The immigration judge really only discusses the calls. There's no finding of fact that the terrorist incident and the break-in were related to the calls. So I think that we have to be careful to not extrapolate out simply because there were coincidences here. I don't think that we have it on the record that those things are related. And so absent some kind of confrontation like that, this Court's decisions on what an imminent unfulfilled threat is don't support a finding that these threats were imminent. Right, but I'm having a hard time because in terms of arguments that are supported, my reading is that the BIA was much more bare-bones than the IJ was. So if there's the information in the discussing of the stalking, the BIA sort of just concludes that the threats don't meet the standard. But the BIA was the one that didn't provide the analysis. I mean, would you respond to that? I agree, Your Honor, that the Board's discussion is much shorter than the immigration judge's discussion. But I think, again, that ties back to what the Board was doing. The Board was looking not for the weight of the evidence here. They weren't conducting a de novo review. The Board was conducting a clear error review. And so that's part of why the discussion doesn't need to go through every piece of evidence that could support things. The Board was simply looking to see whether or not there was a clear error. And those clear errors come up in the legal precepts that underlie the findings of fact. I think that is a way that clear error could be established. Well, how do you think it was established in this case? In this case, the clear error was found based on legal precepts that underlie the findings of fact. So with respect to the past persecution finding, the immigration judge did nothing to discuss some of the guidance from this Court about what constitutes persecution, specifically Ouija Payne. But if that were the case, one might have expected it to be remanded. Well, no, Your Honor, because there's no additional findings of fact needed here. The Board accepted all of the findings of fact, at least up to the point of making the nexus. But what the Board said was unfulfilled threats are insufficient alone to rise to the level of persecution, citing our decision in Ouija Payne. But that's not all that's in the record. So it's not only unfulfilled threats. I mean, I'm surprised you want to emphasize this point when you've got the nexus argument. But, you know, help me out. Tell me why the Board isn't the one that erred rather than the IJ. Because, Your Honor, the Board didn't change any of the findings of fact that underlie the immigration judge's decision. They accepted all of the facts laid out in the immigration judge's statement of facts. And so there really wasn't any additional fact finding that needed to be done. What needed to be done here was an application of the law. So in the case of the past persecution, the Ouija Payne, Rojong Chen, the Ninth Circuit case, Lim, that this Court has incorporated several times. I may not have been clear. When the Board says generally unfulfilled threats are insufficient alone to rise to the level of persecution, isn't it obliged to accurately state that that is indeed all that the record showed? I see my time has run up, Your Honor. I'll do my best to answer your question. I don't think that the Board needs to make any specific discussion of the facts here because the facts were accepted from the immigration judge's decision. What the Board was doing was identifying a legal precept that underlies the ultimate conclusion about past persecution and finding that there was a clear error and a failure to consider that guidance from this Court. A similar analysis stands for the nexus element. I'm sorry that you tons up the matter. No, no, please, please, please. On the CAD claim. Yes, Your Honor. Our decision in Scarlet sent it back to the agency to consider whether an inability to protect demonstrated acquiescence by the agency or actually said inability. It's unwilling or unable and that there needed to be some consideration of inability. We sent it back in Scarlet. In this case, should a similar result occur on that? I don't think so, Your Honor. Just as a preliminary point, I would like to reiterate our position that the CAD claim has been waived here because while the opening brief mentions the CAD finding, there is only one sentence. I assume for sake of argument that we weren't persuaded by that. Certainly, Your Honor. How do you deal with my question? Certainly, Your Honor. I think that Your Honor's point about Scarlet is well taken. If we look at other decisions of this court, I believe we directed in our brief to the case of Olivia Flores versus Holder. I recognize that that's an unpublished decision, but that's talking about the need for there to be evidence that an inability to prevent a criminal activity equates to acquiescence. We don't have any evidence of that here. Well, in Scarlet, the police told the individual that he was on his own. Yes, Your Honor. And here, the police tell her, stay in your home. We can't do anything for you. In Scarlet, we recognize that different circuits have taken different positions on what it means to be unable, and we asked the agency to reconsider it. I wasn't able to find that there has been a decision by the agency yet in Scarlet. So until we get that, aren't we in the same position here where we need the agency to tell us more about how it views the unable versus the unwilling prompt of the analysis? I don't think so, Your Honor. I think that this case is very distinguishable in the evidence that we do have. You're right that in Scarlet, the police told the petitioner that there was nothing that they could do, and that's certainly similar in this case. But I think that the discussion, the evidence surrounding what she was told by the police is important because she wasn't told, we're just totally unable. She was told, we have a lot of claims like yours, and we have to protect the entire municipality, not just you. And she had very little to give the police here. She didn't know who this person was. She didn't have any suspicions or anything. All she had was these calls that say, at some point in the future, you need to give us this money or these terrible things will happen. That's not even a concrete plan that tells her where to pay or how to pay or something that the police could work off of. So this has a lot less evidence, and the discussion, the evidence around what the police told her, I think, is distinguishable here because they weren't saying, we throw up our hands, we don't try. They were saying, we've got a lot of cases like this. If my colleagues have more questions, I have at least one. You bristled a little bit at the suggestion of the cat argument, and I know that you would concede that we can excuse if we were to believe that there were a forfeiture because of manifest injustice. Would the government concede that erroneously sending a woman and child to a place where they may be more likely than not tortured would constitute a manifest injustice? I don't want to go quite that far, Your Honor. Obviously, I understand that this is a sympathetic and a concerning case. I feel for Ms. Mahina as well. But I don't know that it's a manifest injustice when we have the scant evidence we have in this case. And I would just like to identify that if there is an issue with the cat finding, if the cat finding isn't waived and there is an issue with it, that it can be severable from the asylum issue. Well, I thought your separate argument on the cat was that she neither experienced torture nor is there a substantial risk of torture, and that that's based largely on the fact that there's no action taken against other members of her family. I just want to be certain. Is that your alternative argument on the cat? Well, Your Honor, the board's discussion on the cat was that there was an acquiescence here, so that's really where things have to lie is in an analysis. So that's what we focus on? Yes, I think so, Your Honor. Okay, thank you. Thank you very much, Your Honor. I would like to go back to the question that Judge Ratchie was asking a minute ago because I didn't think you answered them satisfactorily. When the board says with respect to past persecution, when the board cites a holding of art to the effect that mere threats that are unfulfilled don't necessarily amount to persecution, that seems to me to presuppose the board's view that that's what correctly describes this record, that all there is in this record is mere threats and not something more which would justify a finding of past persecution. But my perception of the record is that there is much more. It's not just mere threats. It's threats accompanied by all of the evidence of tailing her, of watching her, of calling her on a repeated basis, of the repeated threats to kidnap her son. This is not something that falls into that category of mere threats, and it seems to me that the way the board handled that issue was not satisfactory. Your Honor, I think I understand your question. And certainly, as I say, I sympathize with Ms. Mejia's situation. I have a son. I would be terrified if I received these calls myself, and certainly that could feel very imminent. But if we look at this court's decisions about what constitutes an imminent unfulfilled threat, it just doesn't add up. Scarlett v. Barr, as we've talked a lot about today, that was a case involving verbal harassment and visual surveillance that the petitioner understood to be a threat on his life, and that was found not to constitute persecution. There's also an unpublished decision from this court, Escobar del Cid v. Garland. That just came out back in March. That's 2022 U.S. Applexus 6063. That was a case very similar to ours where we had death threats over the phone. We had three incidents of being followed. At one point, the petitioner was shown a gun and actually had their car kind of bumped into by one of these assailants while that person was yelling threats, and that was still found not to be an imminent threat, an imminent unfulfilled threat. So I certainly understand the concern here, but I think the case law just doesn't support a finding that this is an imminent unfulfilled threat such that we would overcome that general presumption laid out in Ouija Pan. Thank you so much. Thank you. Thank you, Your Honors. Mr. Usher, you've got three minutes. Yes, Your Honors. First, Your Honors, I'd like to address my colleague's argument that the board conducted a clear error review and not a de novo review. In the board's own decision on page 2 at the bottom, it says, further, in our de novo review, we determine that the lead respondent did not establish that the police or other government officials of Guatemala were involved in the acquiescence and any harm to the respondents. So it's clear that the board was conducting a de novo review in this situation. Furthermore, Well, on that point, on acquiescence. On CAT, I would say. Yes. Yes, Your Honor. So certainly there was a clear error review on a portion of the IJA's decision, but not all of it. And I would add that while the AG's office is arguing here that these are mere unfulfilled threats, I would say that the record, as Your Honors have pointed out, shows that there was much more. There was acts in furtherance of and the following and the stalking and the specific threats about her exact physical location were more than unfulfilled threats. But certainly the burglary, which the board failed to address completely, I would say justifies both a granting of asylum, but at the very least a remand so that this matter could go through further proceedings and further evidence could be offered to support these people. Your adversary says that the IJA did not base the findings at that level on the burglary, so that's why the board didn't discuss it. Is that correct? That's not how I read the decision, Your Honor. Certainly it's in a different paragraph, but the IJA does discuss the fact that the burglary occurred. It discusses Ms. Mejia's testimony in regards to the burglary, and it discusses that Ms. Mejia's testimony was, in fact, fully credible. So certainly I find that the burglary was a very necessary aspect of the record, and the glaring, well, sorry, Your Honor, completely not addressing it was certainly error by the board. Thank you. Thank you, Your Honor. Thank you. We will take this case under advisement. And we will next hear from counsel in the United States of America versus Philip Gross. Thank you. Thank you. And Mr. Ossovitch, you have reserved two minutes. Is that correct? That is correct, Your Honor. Thank you. Thank you, Your Honor. May it please the Court, my name is Jay Ossovitch, and I represent Appellant Philip Gross. Mr. Gross, a music teacher who operated a small music school, pleaded guilty to 61 counts of producing child pornography and 13 counts of possessing child pornography. This is not your typical child pornography production case. Mr. Gross hid an emotion-activated camera in the music school's restroom to record images of people relieving themselves. He did not sexually abuse the children. He did not film other persons sexually abusing children. He did not direct them to engage in sexual acts for him to film. He did not direct the children to take sexually explicit photos of themselves or others. He did not coerce them into sending him images. The district court determined that he had a guideline sentencing range of 25,080 months, that is 2,090 years. The district court decided that a variance was appropriate and imposed an aggregate sentence of 600 months, that's 50 years in prison. Would you clarify something for me? The statement that you made is accurate with respect to the cameras that were installed in the toilets, but it seems to me not to be accurate with respect to the videos that you made through the cameras that were on the ceiling, which did observe him, if I am correct, it did observe him, touching, doing unwarranted, inappropriate touching of the children on their thighs and the general genital area and the area of their breasts. So it seems to me the statement that you made was not exactly accurate in describing the basis of the sentence. Your Honor, according to the government, the images that were taken inside the classroom itself from those hidden cameras, well, actually those cameras weren't hidden, they were actually visible. The government described that as grooming behavior. As what? As grooming behavior. Grooming. Yes, ma'am. Yes, Your Honor. They never described it as sexual conduct. They never described it as sexual abuse. If those images are creepy, they're clearly inappropriate, but they were never described by the government as sexual contact. But the judge understood what they depicted, as do we, and so to the extent that you suggested in your argument that all he did was photograph children relieving themselves, that's not accurate, as Judge LaValle pointed out. Now, how we're going to label it is another matter, but it's not just photographing children relieving themselves. No, but he was also never charged for those images. There's a legal significance, and then there is a help us understand this by being more accurate than what you are being right now, so all three of us have suggested that perhaps you be careful with how you're wording this because we are aware of the facts is what I think we're generally trying to tell you. Okay, thank you, Your Honor. I'm sorry. No, go ahead, please. Okay, thank you. The district court imposed an aggregate sentence of 600 months imprisonment. That's 50 years. 360 months for the production counts and 240 months on possession counts to be served consecutively to the 360-month sentence. For him, this is a life sentence. If he doesn't die in prison, the BOP expects him to be released on July 13, 2062, just shy of his 85th birthday. I've raised two points on appeal. The first challenge is the reasonableness of the 50-year aggregate sentence. My arguments are focusing on that this morning. The second point raises the question as to whether the images he produced and some of the images he possessed are, in fact, child pornography. This point has previously been addressed by this court in United States v. Spore. I've raised this issue simply to... Is this a challenge to his guilty plea? This is a possible challenge to his guilty plea. What do you mean possible challenge? The argument is made to us to secure what relief? On that point, we're just acknowledging that we're foreclosed by Spore and that we are preserving this for possible further appellate review based on cases that are going through the circuit, other circuits. And at the time the brief was filed, this was based on United States v. Hilly in the D.C. circuit, and there are other cases that are currently working their way in the circuit. So we're just simply preserving this point. But we acknowledge that within the Second Circuit, Spore controls, and we're not directly challenging that at this moment. But I understand that you're teeing this up for a circuit split in which the Supreme Court might actually decide something different than what is law in here. Is there no way where we can thread the needle such that both Spore and Hilly can peaceably coexist and have your client get the relief that he seeks? Or, period, doctrinally, are they in the future, obviously? Is there a way that we can harmonize this? I see this in the future unless the panel decides to bring this en banc. At the moment, we are not asking for that. No, no, no, I'm asking is there a way to harmonize this moving forward? Not that I can envision at this moment, Your Honor. Okay, so someone has to say it's either Hilly or it's Spore. Correct, Your Honor. Okay, and you understand that we can't do that. Can you ask me, or I'm sorry, can you answer for me, you're conceding that the sentencing is below guidelines. Correct, Your Honor. Can you explain why you don't think that this is an issue that should be left open to Congress and the Sentencing Commission? Because even a sentence below the guidelines may still be unreasonable. The idea within sentencing under Section 3553A is that a sentence must be sufficient but not greater than necessary. And in this case, a de facto life sentence is greater than necessary. The guideline sentence was controlled by the way he was charged in the indictment because he rejected a plea offer by the government. So the government decided to come back and charge him in a 74-count indictment. And that became the controlling factor at sentencing with the court addressing that he had never seen 74 counts in this type of a case. Right, but you read that as that was outrageous on the part of the government. It could be read as this is a real serious predator, and I need to account for it time-wise, right? I mean, I wasn't in the courtroom, but that fact can be cut both ways, at least to the record that we've got in front of us, isn't that right? Well, in terms of a serious predator, if you look at the other types of cases where production has been charged, the acts committed by him, the bathroom camera, does not rise to the same level. For example, in the United States, we only— Right, but it's just not the conduct, right? It's the position of trust. It's the number of people involved. It is the forethought that went into trying to get away with it, right? It's not just—these are all things that are appropriate for the sentencing judge to consider. Would you agree? That is correct, Your Honor, but we also need to look at this in the context of other cases to determine whether or not this becomes a disparity in sentencing. And when we start looking at some of these other cases where there have been positions of trust, we still find that this is a much more serious sentence when it was done by a hidden camera that he was not using to actually have contact with the children in the bathroom, where he was not directing them to do anything. So when we look at cases like Oney, and he did not distribute the images, where the defendant had actually sexually abused the children, he distributed the images. In fact, those images were found in possession of over 3,000 offenders after the fact. We don't have that kind of facts in this case. And in Oney, a lesser sentence was given. May I just be sure I understand? So your client pleaded guilty in the end, not to the original agreement that was offered, but pleaded guilty to the entire indictment, right? Correct, Your Honor. And on the entire indictment, there were 61 counts of production of child pornography. Correct, Your Honor. And am I also correct that each carried a mandatory minimum of 15 years? Correct, Your Honor. So the argument here is that you're complaining that the district judge should have run the counts concurrently rather than some of them consecutively, or shouldn't have reached the maximum? I mean, the sentence equates to the maximum, 30 years- Correct, Your Honor. On one count, concurrent to every other count. Indeed, that's how the sentence is specified. But your client would have received at least 15 years, right? Yes, Your Honor. So what are you saying? That the district judge should only have sentenced him to 15 years or something less than 30 years on one count and run them all concurrently? Somewhere within- Because I think what the concern I have is in doing substantive reasonableness, which is a very deferential standard of review, are we saying that it was outside the broad range available to the district judge to sentence him to the maximum but only have it effectively be for one count? Yes, Your Honor, because we need to start considering this if we're looking at disparities in other types of cases. We need to carefully evaluate what these actions are. And I'm not sure you . . . Let me ask you to reserve the disparity argument for a moment. You're saying that sentencing to the maximum on one count and then breaking that concurrent to every other possession count was outside the realm of options available to the district judge? We think that that was unreasonable in this case, Your Honor.  Well, I think once we start looking at the other types of cases that are, that have occurred with production, we find that this is significantly more severe. Even if you just look at the fact that there were a lot of children, which we do not deny, in production cases, the average sentence that's been imposed according to the Sentencing Commission has been 275 months imprisonment. Now, the district judge explained that by saying he had never seen a case with this many counts, which effectively means this many victims. Well, with 61 victims plus the possession counts, correct, Your Honor? Well, possession is not necessarily all of the children at the school. Correct. The possession count is other children, and I don't mean to minimize that. But I don't think you've shown us another case that had this number of victims, right, in terms of talking about disparity. No, Your Honor. But what we look at in terms of the actions that were involved with the victims, I think we need to take that into consideration. And that's why I was trying to direct the Court's attention to Judge Underhill's dissent in Muzio, where he identifies a number of factors that a judge should take into account when looking at these cases. And that isn't an issue you're preserving, because it's a dissent, right? Yes, Your Honor. It's a dissenting opinion. Yes, it is, Your Honor. But I believe that the Court can provide guidance to the District Court in how to start looking at these cases and to evaluate them. Unless the Court has further questions for me at this time, I believe I did reserve a few minutes for rebuttal. Thank you. Thank you, Mr. Gregory. Good morning. May it please the Court. Catherine Gregory for the United States. This Court should affirm the judgment. I believe Mr. Clos' counsel has just conceded the spore issue forecloses his arguments with respect to the court. I need you to hold the microphone a little closer. Thank you. Or at least higher. Is that better, Your Honor? Thank you. I apologize. I'm a soft talker. I'll try to project more. He's already conceded that the spore forecloses his argument as to the factual basis of the plea. And the District Court acted within its discretion here when it imposed a sentence that, yes, is serious, but reflected the enormity of the conduct in this case. I think it goes without saying that 61 victims, including the nine who were physically molested from ages four and up, over seven years, with Mr. Clos' position of trust, a music teacher, not just of children generally, but specifically special needs children, manipulated the relationship that he could gain access to over such a long period of time. How do you deal with the defense argument that, in terms of looking at the severity of the conduct, the physical conduct was grooming, not sexual abuse? That's how the defense has characterized your position. I want to be sure I understand what your position is. They said it was sexual contact. I think that if we even look at the definition of sexual contact, it's over or under clothing in the groin. I understand that, but they're saying that you represented it as grooming to the District Court. That was one of the ways we described it, but I think we also made the argument that in one of the videos, which we even showed the judge at sentencing, he appears to kiss one of the children, which, granted, you can't quite see it from the angles of the camera, but we were making that argument that there was physical sexual contact. Was he charged with that federally or state? No, he was not. But I can't speak to the strategy that underlies the charging decisions in this particular case. I can say that the judge did see a selection of those videos, including some of the contact with the students. And Judge Sirigusa actually took a very conservative approach in that respect. He said, I'm not going off of what might have happened, or what might have happened had he continued to groom them. I'm going off of what I can actually see with this sentence. As your honors have noted, Judge Sirigusa has been on the bench for 25 years. He has never seen, he said, a case where a defendant pled guilty to 74 child pornography-related counts. And I'll submit that the cases that Mr. Close raises as possible comparators, you simply can't compare it. This case is almost unique. I've never seen a case, I couldn't find a case where there were this many victims, at least coming out of our district. And over this amount of time, with the added physical element. And at the same time, Judge Sirigusa was very careful and deliberate in his reasoning for this sentence. The government asked for, I believe, 61 years, what we've categorized roughly as a year per child. And he went below that. He went to the 600 months, the 50 years. Which, again, is a serious sentence. But I think we can get lost in the numbers a little bit. 61 children. This courtroom holds 64 people maximum. That means that you could fill every seat behind us with one of Mr. Close's victims and there would still be a child waiting in the hallway. And I think that that can't be overstated in this case. Even if, as Mr. Close seems to argue, it's, in his view, not as bad. That there wasn't physical contact. This court has held in several cases that there's no categorical rule that non-contact production of child pornography is in any way less traumatic for the child or less harmful in the long run. And then ultimately, we weren't the ones sentencing. We have to review what the district court did. There's a standard of review. That's correct. And again, it's abuse of discretion. And this court has said it approaches these kinds of substantive reasonableness claims with restraint, not micromanagement. So the question isn't might this court have come to a different conclusion. It's whether the district court abused its substantial discretion in imposing this sentence. Counsel referred particularly to the parsimony clause. What do you say to the response? I'm sorry, Your Honor, to which clause? The parsimony clause. A sentence that doesn't exceed the maximum that's necessary to fulfill the purposes of sentencing. I would submit that Judge Sirigusa at sentencing explained that he was looking for something that wouldn't. He said several times, I'm looking for a sentence that's sufficient but not greater than necessary. And that he was aware of the need to avoid unwarranted sentencing disparities. I think that's key to unwarranted sentencing disparities. Because disparity just means a difference. And ultimately, how a district court weighs a violent physical contact with one child versus less physical but still traumatizing contact with 61 children. I think that Judge Sirigusa was mindful, explained why he was trying to come to what he saw as an appropriate number that would ensure justice for every child. But again, I believe even in his briefing, Mr. Close concedes that there are sentences that are above this. And there are sentences that are below this in the child pornography category. And that this does fall within that general range. And in this case, again, approaching this with an eye towards restraint, not micromanagement. And the fact that this is an abusive discretion standard. The district court did act within its discretion, weighing those facts and circumstances carefully when it came to a sentence and imposed a sentence that is reflective of the enormity of the conduct in this case. And unless the panel has further questions, we ask you to affirm the judgment. Counsel, you have two minutes. Thank you, Your Honor. I think it's important to distinguish how the government characterized this because it also characterized the behavior in the classroom as grooming because it also distinguishes between what they viewed as sexual behavior and how they could have charged him for that conduct. But, you know, there's grooming where you buy the child pretty things or toys or whatever. And then there's grooming like this that makes the child think that this kind of physical conduct is acceptable so that then the next step can be done. But this was physical conduct. So, you know, I'm not sure how much the grooming label helps us here. The judge saw what it was. Yes, Judge. Yes, Your Honor. What's also worth noting, however, is that some of these students that he was grooming, it was over a long period of time and nothing went beyond that behavior. So even though he was grooming them, we'll accept that term for the moment, he never went any further than that. So he never went further, never tried to engage in any other types of conduct with them. So I think those are important distinctions. The 74 counts, while the court did focus on that, the 74 counts were based on the fact that Mr. Close turned down a two-count indictment that would have required him to waive his right to appeal a 60-month sentence. And the judge indicated at the plea hearing that he understood why this occurred because that is, again, a sentence that we believe is greater than necessary to serve the purposes of sentencing. We believe that in Mr. Close's case, a lesser sentence would be sufficient to accomplish the goals of imposing inadequate punishment and to deter future conduct in avoiding unwarranted sentencing disparities. Thus, I respectfully request that you vacate the judgment and remand the case to the district court for resentencing. And to the extent you think we should provide guidance to the district court, at what point does the district court have, would it be a reasonable sentence, a substantively reasonable sentence as a matter of law? I don't know if at this point we can say what is a reasonable sentence. I think we would have to look to see what happens at sentencing. What more or less should be happening at sentencing? Because if we send this back down to the district judge and it imposes a 40-year sentence or a 45-year sentence, are we going to be back up here again? I can't say that honestly at the moment, but I think if you provide some guidance for the court to look at, such as what Judge Underhill suggested in Muzio, I think we can start to distinguish this case. But I don't ignore the fact, as you said, that this could very well be a life sentence for the defendant. It's 50 years. I understand the severity of that sentence. But another way to look at it is at least on the production count, it's two years per child, which doesn't sound nearly as severe. Your Honor, I agree that this is a life sentence. I think when you start to look at other production cases, where the harm that was performed on the child was actually much more severe, where the children had been raped, where their images had been sent around the country. Right, but there are not 60 of them. No. That's why I said to you we can look at it from the gross perspective that it's a 50-year sentence and be very affected by that, or we can look at it as two years per child, which may seem like a modest sentence. So tell me at what point the law would step in and find this to be a substantively reasonable sentence. I think at the point that we can determine how we can distinguish this case from the other cases where this has occurred. All right, thank you. Thank you, Your Honor. We will take it under advisement. And then the last case on argument is Bronstein v. Sahara Plaza. Thank you. And Mr. Laniato, am I pronouncing your name right? Laniato, Your Honor. Laniato? Yes. Thank you. You've reserved two minutes, is that correct? That's correct. We are ready when you are. May it please the Court. In this gender discrimination case, it is respectfully submitted that the district court erred in granting summary judgment in favor of the defendants dismissing the plaintiff's claims of gender discrimination, harassment, and retaliation. The court properly found that the plaintiff had established a prima facie case of unlawful gender discrimination and retaliation. The court found that the defendant had succeeded in shifting the burden to the plaintiff, back to the plaintiff, by alleging that it had a proper ground for dismissing, terminating the plaintiff's employment. The asserted ground was the subjective standard of that she was difficult to work with. And then the court, despite the finding of prima facie gender discrimination and retaliation, concluded that the plaintiff had failed to raise an issue of fact and had not presented any proof sufficient to defeat summary judgment on the issue of pretext. It's respectfully submitted that the plaintiff did succeed in meeting her burden, that the court's finding of prima facie discrimination and disparate treatment evidencing discriminatory intent, that is evidence that can be used on the issue of pretext and sufficiently established that the plaintiff's termination or the reasons for her determination should at least be permitted to be determined by a jury. Can you talk to me about a couple of things like the same actor inference? Like it was Mariano that hired and fired the plaintiff within the span of a short period of time. Presumably, the inference is that he wasn't going to be discriminatory toward her because he hired her, but then he was the same actor that fired her. Should we consider this inference at all? I don't believe that we should. Under the circumstances, we're two things. Mariano, number one... Well, there's case law that says we should consider it. Considering it, yes, but I don't think it should be applied. Or if the inference is applied, the plaintiff should be permitted to rebut it and should be able to have that issue determined by a jury. Despite that inference, Mariano himself demonstrated discriminatory bias. Perhaps more importantly, he based... And the evidence of the bias is the inappropriate language he had in the conversation that she recorded. That's part of it, in addition to the fact that he had treated her differently. There was disparate treatment as well between her and her all-male co-workers in terms of how complaints were treated, complaints against her. She was not given an opportunity to respond. The complaints were given credence. Whereas when she was complained, no action was taken. Perhaps more importantly, it appears that Mariano based his determination to terminate the plaintiff based on a performance review, which was, number one, inaccurate according to the plaintiff's testimony, but, two, was created by someone who the court found to have exhibited discriminatory animus and disparate treatment, and another who the court... I didn't see you allege cat's paws. I mean, is that your theory of liability? Say it again? The cat's paw theory? The idea that Mariano was manipulated by either Whitnerson or Durow? Not necessarily manipulated, but certainly influenced in reaching his conclusion. But you didn't allege that, right? Honestly, Your Honor, I'm not sure if it's alleged in the complaint, but it's certainly argued in the papers. How does the evidence support that? What evidence is there to support that? Mariano explained that his determination to fire the plaintiff was based on the performance evaluation, and the lower court found that as well. Mariano expressed, testified that the determination to terminate the plaintiff's employment was premised on the input from his supervisors, and those supervisors... I'm sorry, her supervisors. Those supervisors were Durow. It's not that he has to have just looked at that. In our decision in Nagel, it says you have to show the evidence that Mariano merely served as a conduit vehicle or rubber stamp by which people like Whitnerson or Durow would have achieved their design, and I'm not sure you produced any evidence that that was the case, that it was based entirely on her allegedly poor performance review by Whitnerson. I believe that it was, Your Honor, because if you look at Mariano's own explanation for... The point is that he received numerous complaints about her, and he concluded that after several attempted interventions, the plaintiff was not addressing her own behavior and demonstrating a willingness to change it. He may have testified to that, but he also testified that he believed she was a good worker. He believed that she responded to criticism well, that she was... But this was his ultimate conclusion based on the numerous complaints he was receiving. Well, again, in terms of the complaints, he didn't hear the plaintiff out. He didn't give her an opportunity to address them. Our task here is not to decide whether or not they should have fired her, but whether they did so for an impermissible reason, and that's my concern is how do you demonstrate that Mariano did so either for an impermissible reason or because he was basically manipulated by others? I think that, Your Honor, there's sufficient evidence to permit a jury to reach that conclusion. Number one, based on the fact that Mariano exhibited disparate treatment and discriminatory animus, that he testified that he based at least in part on the performance of... I don't think your arguments about disparate treatment are merited at all because the persons you compare her to are not comparable, and the comparisons simply, they're not the same. But tell me more about the discriminatory animus. It seems to me that the evidence of discriminatory animus on the part of Mariano, at least, is extremely thin. So tell me what you think is the best case for the discriminatory animus on the part of Mariano. Well, Your Honor, I think it starts with something as simple as when she went to complain about the performance evaluation, he used that, I won't say the term here, but he used that derogatory term that had been used pervasively throughout her employment by Mariano, as well as the other supervisors and coworkers that she... Don't say you're not going to use the discriminatory term. We're here to talk about the evidence, so tell me what the evidence is. Okay, when she complained about her performance evaluation, his response was, what do you expect, you're a bitch. I believe that that, you know, and again, the plaintiff testified that that word was used pervasively, not just by her supervisors and coworkers, but by Mariano himself. It was being used in the context of telling her that she was extremely difficult to work with, and, you know, not cooperative in various ways. So I'm not sure how we would automatically assume that meant gender hostility. Indeed, in the Pacino versus Verizon Wireless case, we rejected a rule that would automatically use that, automatically infer from that word gender hostility. I'm not saying that that's the sole basis of the gender hostility. Judge LaValle asked you for what your best evidence was, so beyond the use of that word, what else is there to show Mariano...